UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | | |
|---|---|---|
| DAVID LEE FONTENOT, DOUGLAS L. FONTENOT, AND HENRIETTA L. FONTENOT | * | DOCKET NO._____ |
| | * | JUDGE: _____ TRIMBLE |
| VS. | * | MAG. JUDGE:_____ WILSON |

**EACH OF THE FOLLOWING
DEFENDANTS, INDIVIDUALLY
AND IN THEIR OFFICIAL
CAPACITIES:**
RAYFORD FONTENOT, AS
DEPUTY SHERIFF OF JEFFERSON
DAVIS PARISH SHERIFF'S OFFICE,
MIKE CONNER, AS CHIEF OF POLICE
OF THE TOWN OF LAKE ARTHUR
NICHOLAS BROUSSARD, AS POLICE
OFFICER FOR THE TOWN OF LAKE
ARTHUR,
ANDREW BENOIT, AS POLICE OFFICER
FOR THE TOWN OF LAKE ARTHUR,
MONTY CHEVALIER, AS POLICE OFFICER
FOR THE TOWN OF LAKE ARTHUR,
MICHAEL CASSIDY, AS DISTRICT ATTORNEY
FOR JEFFERSON DAVIS PARISH,
ANDRE BUISSON, AS ASSISTANT DISTRICT
ATTORNEY FOR JEFFERSON DAVIS PARISH,
RICHARD EDWARDS, JR., AS SHERIFF OF
JEFFERSON DAVIS PARISH,
**AND THE FOLLOWING ENTITIES:**
THE TOWN OF LAKE ARTHUR,
LAKE ARTHUR POLICE DEPARTMENT,

FILED:_____        DEPUTY CLERK:_____

**DEMAND FOR TRIAL BY JURY**
**********************************************************************************************

U.S. DISTRICT COURT
WESTERN DISTRICT
OF LOUISIANA
FILED

02 AUG -2 PM 3: 10

ROBERT H. SHEMWELL
CLERK
BY_____
DEPUTY

U. S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
FILED

AUG - 2002

ROBERT H. SHEMWELL, CLERK
BY_____ DEPUTY

CV 02 - 1639

## COMPLAINT
## FOR MONEY DAMAGES AGAINST POLICE OFFICERS, MUNICIPALITY, PARISH, AND PROSECUTOR FOR DEPRIVATION OF CIVIL RIGHTS UNDER COLOR OF STATE LAW, CONSPIRACY, AS WELL AS FOR STATE LAW CLAIMS FOR BATTERY, ASSAULT, INFLICTION OF EMOTIONAL DISTRESS, AND MALICIOUS PROSECUTION

The Complaint of David Lee Fontenot, Douglas Fontenot, and Henrietta L. Fontenot, wife of Douglas Fontenot, persons of the full age of majority and resident-domiciliaries of Lake Arthur, Louisiana respectfully alleges, avers and shows on information and belief as follows:

### INTRODUCTION

1.      This original complaint for money damages, filed within one year of the 21 June 2001 dismissal of state law criminal charges against plaintiff, David Lee Fontenot, is filed against certain individuals:  including, present and former police officers of the Town of Lake Arthur, sheriff's deputies of the Parish of Jefferson Davis, prosecutors for the Parish of Jefferson Davis;  as well as against the following entities: the Town of Lake Arthur,  and asserts causes of action for violation of plaintiffs' federal constitutional rights, as well as state law claims for battery, assault, intentional and negligent infliction of emotional distress, and malicious prosecution.  Plaintiffs allege that they suffered damages as a result of the intentional and/or reckless, wanton and malicious actions of the individual defendants, acting alone and/or in conspiracy with each other.  Plaintiffs also suffered damages as a result of the intentional indifference to citizen's rights exhibited by the Town of Lake Arthur, and prosecutor's office - - and those entities' police departments.

### JURISDICTION

2.      This Court has original jurisdiction pursuant to 42 U.S.C. § 1343 and 28 U.S.C. § 1331 over the claims for relief provided by 42 U.S.C. § 1983 for deprivation of civil rights.

3. Pursuant to 28 U.S.C. § 1367, this Court also has supplemental jurisdiction over the state law claims asserted herein which derive from a common nucleus of operative fact as plaintiffs' federal claims, and thus are so related to plaintiffs' federal claims that they form part of the same case or controversy under Article III of the United States Constitution and plaintiffs would ordinarily be expected to try them all in one judicial proceeding.

## DEFENDANTS

4. Plaintiff names as defendants herein the following:

i) RAYFORD FONTENOT, individually and in his official capacity as a police officer with the Jefferson Davis Parish police department;

ii) MIKE CONNER, individually and in his official capacity as Chief of Police of the Town of Lake Arthur;

iii) MONTY CHEVALLIER, individually and in his official capacity as Chief of Police of the Town of Lake Arthur;

iv) ANDREW BENOIT, individually and in his official capacity as a police officer with the Lake Arthur police department;

v) NICHOLAS BROUSSARD, individually and in his official capacity as a police officer with the Lake Arthur police department;

vi) The LAKE ARTHUR POLICE DEPARTMENT;

vii) The TOWN OF LAKE ARTHUR;

viii) RICKY EDWARDS, JR., individually and in his official capacity as Sheriff of Jefferson Davis Parish;

ix) MICHAEL CASSIDY, individually and in his official capacity as District Attorney for the Parish of Jefferson Davis;

x) ANDRE BUISSON, individually and in his official capacity as Assistant District Attorney for the Parish of Jefferson Davis;

## FACTS

5.      Shortly before 5:30 p.m. on January 20, 1998, Mr. Shirley Guidry, who serves as Eucharistic Minister for Our Lady of the Lake Church on 203 Commercial Street, in the Town of Lake Arthur, Louisiana, was preparing to serve communion to so-called "shut-ins," who could not attend regular Mass at the Church, and discovered that the church's tabernacle was completely empty.

6.      Seeking an explanation, Mr. Guildry reported this discovery to Father Maurice "Marty" Martineau, a Catholic Priest who had at the time been in Lake Arthur for  six months serving as Pastor at Our Lady of the Lake Church.

7.      After confirming that the Tabernacle's contents were missing, Father Martineau, along with Mr. Guidry and Arthus Leger, the Church's maintenance man, searched throughout the Church, and surrounding grounds, including the cemetary, to no avail.

8.      Father Martineau then phoned the Lake Arthur Police Department at approximately 5:30 p.m. to report the theft of the Tabernacle's contents.

9.      Lake Arthur Police Chief Mike Conner, accompanied by Lake Arthur Police Officers Andrew Benoit, Nicholas Broussard, and Monty Chevallier, immediately responded d to Father  Martineau's call by going to the church to investigate.

10.     While at the church, the officers were given a description of the contents of the Tabernacle, to-wit: a Ciborium (gold-plated goblet, valued at approximately $245.00), a Luna Holder (a circular, all gold metal container, used as a container for a large communion host), as well as approximately 200-250 hosts (small circular wafers used for Communion during the Mass).

11.     While at the church, the officers surveyed the scene and found that the words "Fuck Victoria" were written on the dusty rear window of the church.  The police also observed some footprints in the soil at the east entrance at the front of the

church. The police photographed the crime scene.

12.     Father Martineau could not provide the police with any names for possible suspects.

13.     On information and belief, neither Mr. Guidry nor Mr. Leger provided any names to the police as possible suspects.

14.     ab     On information and belief, Chief Conner suspected that the reported theft of church property may be related to satanic practices. Chief Conner then remembered that Mr. Beal, the Manager of the Market Basket, a grocery store in Lake Arthur, had previously complained about "kids" hanging about the front of the store with Tarot cards and satanic literature.

15.     After completing his scene investigation, Chief Conner left the church and went to the Market Basket to find out the names of the "kids" that were the subject of Mr. Beals' past complaints. On information and belief, and as reported by Officer Monty Chevalier, during Chief Conner's inquiries with Mr. Beal and/or other persons at or around the Market Basket, the Chief was given the names Justin Oliver, David Fontenot, and James Vincent. Those sources led Chief Conner to believe that Justin Oliver was the "leader" of the "kids" involved in the satanic practices.

16.     From undisclosed sources, Chief Conner learned that the suspect Justin Oliver was the brother of John Oliver, with whom Chief Conner was familiar from previous encounter(s). In those previous encounter(s), Chief Conner learned that John Oliver resided with his family at a location outside the city limits of Lake Arthur.

17.     Chief Conner phoned the Jefferson Davis Sheriff's Department and requested the assistance of a parish deputy to accompany Chief Conner as his investigation proceeded outside the Lake Arthur City Limits, the Chief's jurisdiction. Deputy Rayford Fontenot of the Jefferson Davis Police Department was assigned to assist Chief

Conner.

18.     At some point in his investigation, Chief Conner learned that Justin Oliver had a girlfriend who lived on McClure Street and that Justin had been at her house the previous evening.

19.     At 8:15 p.m., Monty Chevalier witnessed a Consent to Questioning form, executed by Brenda Parsley, giving Monty Chevalier permission to question her son, Timothy Parsley, about the church burglary.

20.     At approximately 8:54 p.m., Chief Conner and Deputy Rayford Fontenot proceeded to a trailer located at 2029 Eighth Street, known to Officer Conner to be the residence of the Olivers.  Before arrival there, Chief Conner radioed to Officers Andrew Benoit, Nicholas Broussard and Monty Chevalier to assist in trying to arrest Justin Oliver at the Eighth Street address.

21.     Upon arrival at the Eighth Street address, the police officers encountered John P. Oliver (Justin's father), John Oliver (Justin's brother) and Justin Oliver.  After being advised by police that they were investigating a theft at the church, John P. Oliver told police that he is a truck driver and had just arrived home.  Mr. Oliver allowed the officers to question his minor son, Justin Oliver, in his presence, at which time Justin admitted that he had gone to the Church; Justin Olivier, however, maintained at first that he had only stolen some bottles of Holy Water.  After eliciting this admission, the police placed Justin Oliver into Officer Monty Chevalier's police car and told Mr. John P. Oliver that Justin was being brought to headquarters for further questioning.

22.     At 9:08 p.m., Officers Chevalier and Broussard returned to the Lake Arthur Police headquarters with Justin Oliver.

23.     Meanwhile, Chief Conner and Deputy Rayford Fontenot and Officer Benoit proceeded to a house on McClure Street, thought to be the residence of Justin Oliver's girlfriend.  Upon arrival, Chief Conner and Rayford Fontenot encountered

Cynthia Lee LaFosse, the legal guardian of Victoria Perez. Upon questioning, Ms. LaFosse and Victoria Perez admitted that Justin Oliver was a frequent visitor to their home, as he was good friends with Victoria. However, they denied any knowledge of the stolen church property. At that point, Chief Conner, Deputy Fontenot and Officer Benoit obtained Ms. LaFosse' verbal consent to search her residence, whereupon the police located and confiscated a black knapsack containing the missing Ciborium and the Luna Holder. Upon further questioning, Ms. LaFosse and Victoria Perez confirmed that the knapsack belonged to Justin Oliver. The women denied any knowledge of its contents. The police photographed Victoria's bedroom, where the knapsack was found, and confiscated other items which the police believed were related to Satanic practices.

24. At police headquarters, Justin Oliver was subjected to custodial interrogation outside the presence of his father. During that custodial interrogation, the police used highly suggestive methods of questioning, telling Justin Oliver that they already knew of his participation in the theft of church property because two other people whom police claimed were "perpetrators," i.e. David Fontenot and James Vincent, had already implicated Justin Oliver in the crime. Under police threats of "life imprisonment" if he did not confess to his part in the crime, Justin Oliver finally acquiesced to police pressure and agreed to write a statement.

25. Eventually, Justin Oliver's father arrived at police headquarters and signed a written consent at 9:50 p.m. allowing police to further question his son. Under the direction of the police, and in the presence of his father, Justin Oliver proceeded to draft the first of at least two versions of a written statement, incriminating himself, and also implicating David Fontenot and James Vincent.

26. In what is believed to be the first statement, which was executed at 10:22 p.m. on January 20, 1998 and purported witnessed by John P. Oliver, Monty K. Chevalier, and Mike R. Conner, Justin Oliver purports to "confess" that around 9:30 p.m. on  the night of the church theft, he left "Vicki's house" and met with "David

Fontenot and James Vincent" at the park. This confession goes on to elaborate, *inter alia,* that Fontenot and Vincent told Oliver to "wait here" while they disappeared and later returned with a "goblet", "gold thing," and "crackers" and that Justin Oliver's role in the theft was merely to hide the stolen items, insinuating that he never entered the church. According to the statement, Justin put the stolen articles in his knapsack and brought them to "Vicki's house." The statement, however, admits, inconsistently, that Justin personally "took 20 bottles of holy water and gave a bottle to Vicki and David and kept one myself." Endeavoring to explain the inconsistency between the statement that he never entered the church, except to take the holy water, Oliver suggests: "That was earlier, though. They didn't know the holy water was what the bottles were filled with." After witnessing this statement and having been told that his son would be sent to a juvenile detention facility, John P. Oliver returned home, leaving his son in police custody.

27.     After his father left, police continued their custodial interrogation of Justin Oliver. This subsequent interrogation focused on inducing Oliver "elaborate" about David Fontenot's purported involvement in the crime. Part of this second interrogation session was carried on during and after the interrogation of David Lee Fontenot at police headquarters, during which Oliver overheard the coercive interrogation (described later below) of David Fontenot. Fearing that he would get the same treatment as David Fontenot if he did not do what police demanded, Justin Oliver executed a second statement, not signed by any witnesses, which also purports to have been executed at 10:22 p.m. on January 20, 1998.

28.     The second statement written by Justin Oliver, at police direction, states that "all 3 of us went inside," but that "James acted as a " while Justin and David went up to the alter where they stole the "chalice" and the "metal deal." In this statement, James states that he had taken "two jars of holy water before we went to the alter." The statement then relates how Justin brought his book sack to Vicki's house but that he hid

the"crackers" under the trailer that served as his residence.

29.    Between the time that the first and second statements, referenced above, were  executed by Justin Oliver, Lake Arthur police officer, Andrew Benoit, upon instruction from other officers, left the Lake Arthur Police Station and proceeded to go pick up "David Fontenot" at an address on Derouen Street.   After Officer Benoit retrieved David Fontenot of Derouen Street, he brought him to police headquarters where he was displayed to Justin Oliver.

30.    Justin Oliver, unaware that David Fontenot of Derouen Street was the cousin of Vincent James,  did not recognize that this David Fontenot was the David Fontenot who, he, Justin Oliver, knew to be an associate of Vincent James, whom police had suggested was a perpetrator.   Justin Oliver, having attended Lake Arthur public school and being familiar with a second David Fontenot who resided in the Lake Arthur area, told police that the David Fontenot that Justin Oliver believed associated with Vincent James lived on Highway 26.

31.    At 10:40 p.m., Officers Benoit and Chevalier went to an address at 326 on Highway 26, which was plaintiffs' residence.   While there, David Lee Fontenot's brother answered the door and in response to police inquiries about David Fontenot, summoned his brother, to the front door.   Police then took David Fontenot into custody and proceeded to escort him to Officer Andrew Benoit's police car.   At this point, Henrietta Fontenot, David's mother, approached the police and was told that her son was being questioned about a church theft and that police would bring him back after they were through questioning him.

32.    Upon his arrival at the police station, the officers instructed plaintiff to close his eyes as he was made to stand in front of a cell.   After being told that he had just been "identified," David Fontenot was led into an interrogation room where police

provided him with a written Miranda warning, which plaintiff executed, and which stated that he did **not** wish to make a written statement.

33.     Notwithstanding his assertion of his Fifth Amendment Right, plaintiff David Fontenot was subjected to coercive custodial interrogation techniques designed to elicit an incriminating written statement, as more fully set forth below.

34.     For a time, plaintiff was interrogated in front of numerous police officers, including Rayford Fontenot of the Jefferson Davis Sheriff's Department, as well as Chief Conner, Andrew Benoit, Faron Schexnayder, and Monty Chevalier, as well as other Lake Arthur Police officers whose names are presently unknown.  Each of these officers took turns demanding that plaintiff "confess" to the theft of church property and argued with plaintiff, who maintained his innocence and, in desperation, pleaded for police to contact his alibis and/or give him a lie detector test if they did not believe him.

35.     Having no interest in investigating plaintiff's claims of innocence, Chief Conner displayed the knapsack retrieved from Victoria Perez's residence, along with a Satanic Bible, and attempted to have plaintiff put his fingerprints on those objects, which  plaintiff refused to do.

36.     Employing the same suggestive interrogation techniques they had used with Justin Oliver, police suggested to plaintiff that he had been seen riding his bike around the Market Basket, the washateria and the park before the theft and that the "bi-sexual" boy had identified him as a perpetrator of the church burglary.  Plaintiff continued to maintain his innocence, and denied that he had a bike, or that he was involved in the church theft.

37.     The heavy set bearded Lake Arthur police officer threatened plaintiff, stating that he would be going to go to jail and be "raped by a big black guy" and would  "be their bitch."

38.     Mike Conner threatened plaintiff, stating that the judge is Catholic, that

he knows the Judge, and that he would make it very hard for plaintiff, who would be sent to jail for 10 years.

39.    In addition to the aforementioned statements, the officers continued to scream at plaintiff and use other profanities. At one point, Rayford Fontenot kicked the back of the chair on which plaintiff was sitting, grabbed plaintiff and choked him around the throat. Rayford Fontenot continued to scream closely into plaintiff's face and then started slapping plaintiff on the head, demanding that he "confess." Plaintiff, however, maintained his innocence in the presence of the group of officers.

40.    Thereafter, Chief Conner and Deputy Robert Fontenot stepped outside of the interrogation chamber for a few moments. When they returned, Chief Conner ordered all officers to leave the room, leaving plaintiff alone with Rayford Fontenot. While alone with plaintiff, Rayford Fontenot committed numerous acts of extreme intimidation and physical abuse designed to coerce an incriminating statement, including the following actions:

! Took off his gun belt, put it on the desk, grabbed plaintiff by the shirt, and began to beat him as Rayford hollered that plaintiff better say he did it;

! Threw plaintiff against the wall and started hitting him on the head;

! Slammed plaintiff against some metal lockers and hit him in the stomach with his knee;

! Dragged plaintiff around the room by his arm, at the same time slapping him in his head;

! Repeatedly shook plaintiff while yelling at him;

! Told plaintiff that "we could be in here all night doing this."

41.    Eventually, plaintiff broke down crying, believing that Rayford was going to kill him. Finally, plaintiff asked Rayford whether he wanted plaintiff "to say what you want to hear?" When Rayford replied "yes," plaintiff said, "then I did it." After that, plaintiff was presented some paper upon which he executed a short "statement,"

which purports to having been signed at 12:07 (presumably a.m.).

42.    Meanwhile, hearing the noise from the interrogation chamber, including plaintiff's hollering and the noise of plaintiff being slammed into the metal lockers, Officer Faron Schexnayder grew uncomfortable, and returned to the room, notwithstanding his having been instructed to stay out. Upon coming into the room, Officer Schexnayder observed plaintiff crying while holding an ink pen in hand and writing a statement that was being dictated by Rayford.

43.    Officer Chavalier apparently recognized Deputy Schnexnayder's actions and told Deputy Schnexnayder that "no matter who asks me, I'm going to say that I was in he room with them and that Rayford was never alone with him; this is a brotherhood and we all have to stick together on this."

44.    However, unbeknownst to the police, Patty Conner Dubois, who happens to be the first cousin of Chief Conner and who was being detained on unrelated charges in a cell across the hallway from where plaintiff, overheard what she believed were desk and chairs being thrown around, as well as plaintiff's cries, and was "terrified" for plaintiff.

45.    Also unknown to the police, Debra Sue Vincent, the mother of James Vincent, overheard the loud noises from the interrogation chamber associated with David Fontenot's interrogation by police, as a result of the following events.

46.    After the police had arrested Justin Oliver, and after they picked up David Lee Fontenot, Officer Rayford Fontenot and another officer picked up James Vincent, a minor, from his home. As James Vincent walked peaceably to the police car, followed by Rayford Fontenot, Rayford told Vincent (DOB 08/15/83) age 15 years, "Don't even think about running because I will put a hole in your leg." Rayford then placed Vincent into a police vehicle. During the ride to the police station, Rayford became loud and abusive, acting like he was crazy, and kept telling Vincent that he was guilty "of what we was going to the police station for" and that if Vincent said

differently, that Rayford would "kick my ass." In response to Vincent's statements that he did not know what Rayford was talking about, Rayford told Vincent that police already "had the evidence and statements" from other people and that Vincent had better not try to say he was not guilty of what they were going to charge him with.

47.     Upon his arrival at the police station, James Vincent was also made to stand in front of the cell containing Justin Oliver, who was intimidated into identifying him as a perpetrator.

48.     Upon police questioning of James Vincent as to his whereabouts on the previous evening, Vincent readily admitted he had been with his cousin, David Fontenot, but he maintained that he had no knowledge of any church burglary. However, as a result of the suggestive custodial interrogation techniques used by the police, out of the presence of his mother, Vincent eventually acquiesced to the police officer's demand that he sign a statement under their direction.

49.     Meanwhile, Mrs. Vincent arrived at police headquarters. At approximately 11:00 p.m., she signed a Wavier of Rights Juvenile form giving police permission to question her son.

50.     At the police station, police officers, including Mike Conner, Andrew Benoit, Lloyd "Peanut" Deshotel, and Faron Schexnayder continued their suggestive interrogation of James Vincent, during which police suggested to him that he had been seen with David Fontenot and Justin Oliver committing the church burglary, and that Vincent should give a last "hug and kiss" to his mother because the police were going to send him to a boy's home and he would never see her again unless he "confessed."

51.     On information and belief, Chief Conner eventually directed James Vincent to sign a statement implicating David Fontenot. At the time that Chief Conner directed James Vincent to write this statement, Chief Conner had been reminded and/or remembered from a previous police encounter between Officer Lloyd "Peanut" Deshotel and David Michael Fontenot, that there were in fact two David Fontenot's in

town, who were not related.   Chief Conner, therefore, instructed Vincent to use the name "Capone Fontenot" in describing the role of that David Fontenot had in the crime.   Chief Conner further instructed Vincent to write that "Capone" was Vincent's cousin, all of which Vincent knew to be false.   Chief Conner also directed  Vincent to state that Vincent served as a "lookout" for Oliver and Fontenot, but that Vincent had gotten scared and left the scene in the middle of the crime.

52.    While at the police station during her son's interrogation, Ms. Vincent overheard the loud noises associated with the coercive interrogation of plaintiff, David Fontenot.

53.    At some point in his investigation, Chief Conner either knew or should have known, based on the facts gathered during his investigation, including the various statements elicited from James Vincent, as well as those coerced out of Justin Oliver and David Fontenot, that James Vincent's reference to spending time with his cousin, David Michael Fontenot, was consistent with David Lee Fontenot's claims of innocence, because  David Lee Fontenot denied that he was James Vincent's cousin and denied that he owned a bike.  Thus, Chief Conner  knew or should have known that he had no probable cause to maintain the arrest of David Fontenot.

54.    At that point, Mike Conner allowed James Vincent to go home at 12:30 a.m. with his mother, indicating that Vincent's statement was unsatisfactory and that Vincent should rewrite it at home and turn it in later, which the Vincents never did as it was all lies.

55.    After his interrogation session finally ended at 12:42 a.m., Patrolmen Benoit and Monty Chevalier took Justin Oliver, age 16 years, to the St. James Youth Detention Center.

56.    Before he could arrange bail for his son, plaintiff Douglas Fontenot phoned J.B. Broussard, the investigator for the District Attorney's Office, to ask him to intervene to ensure that his son was not placed into a cell with dangerous inmates.  At

that time, Douglas Fontenot also told Mr. Broussard that his son had been physically abused by the police while in their custody. In response to these conversations, Mr. Broussard went to the jail and, using a Polaroid camera, photographed plaintiff David Fontenot, but did so from a distance, in an effort to minimize any claim of abuse.

57.    Following their interrogation of David Fontenot, he was placed in a cell with other detainees, until his father, plaintiff Douglas Fontenot, could arrange bail.

58.    After paying $1,500 to the Court as a cash bond to bail his son out of jail, Douglas Fontenot immediately brought his son, David Fontenot, to Mr. J.B. Broussard at the Jefferson Davis Parish District Attorney's office, and complained about the actions of the Jefferson Davis and Lake Arthur police. During that meeting, Mr. Broussard showed the Fontenots the Polaroid photos that he had taken, at which point Douglas Fontenot complained that the quality the photos did not do true justice in memorializing the injuries sustained. When Doug Fontenot pointed out his son's black eye, as well as the bruises around his son's neck, corroborating that his son had been beaten and choked during the custodial interrogation, Mr. Broussard became loud and defensive and remarked that law enforcement had to "protect our own."

59.    After his meeting with J.B. Broussard, the Fontenots returned home and phoned for an appointment with Dr. Kang. They also took photographs of plaintiff's injuries.

60.    On information and belief, J.B. Broussard related details of his Tuesday January 20, 1998 meeting with the Fontenots to Michael C. Cassidy, Andre Buisson, and other staff at the District Attorney's Office. This information was, in turn, related by Mr. Broussard and/or other staff at the District Attorney's Office to members of the Lake Arthur police department, including Chief Mike Conner.

61.    Later, on January 20, 1991, Patty Conner Dubois was asked by Mike Conner (her first cousin) if she "heard anything" the previous night. She replied "yes, that she heard the commotion and the kid crying." This constituted a reference to the

interrogation of David Lee Fontenot and put Chief Conner on notice that knowledge of the coercive interrogation of David Lee Fontenot was not contained to members of the police force.

62.     On information and belief, members of the Jefferson Davis Parish District Attorney's and/or attorneys who customarily defend the Jefferson Parish District Attorney's Office and Town of Lake Arthur police, gave instructions to the Lake Arthur Police Department and the Jefferson Davis Sheriff's Office that the officers concerned with the detention of David Fontenot at the Lake Arthur police department draft statements, purporting to memorialize their version of events and to also obtain written statements from any lay witnesses, upon whom police purported to rely in their investigation.

63.     On January 23, 1998, Officer Curtis L. Fontenot, employed with the Jefferson Davis Sheriff's Office, and assigned to work in corrections, was directed by Chief Conner to prepare a "voluntary statement" purporting to memorialize what he knew about the circumstances of David Fontenot's detention at the Lake Arthur police station.

64.     On January 23, 1998, Officer Troy A. Cary, employed with the Jefferson Davis Sheriff's Office, and assigned to work in corrections, was also directed by Chief Conner to prepare a "voluntary statement" purporting to memorialize what he knew about the circumstances of David Fontenot's detention at the Lake Arthur police station.  Officer Cary reported that at 1:56 a.m., Rayford Fontenot brought David Lee Fontenot to Deputy Cary to be booked in for a felony.

65.     Following this, Rayford Fontenot prepared a "voluntary statement" purporting to memorialize his version of the investigation and arrest of David Fontenot for the church burglary, which account failed to disclose the suggestive and coercive interrogation tactics that had been used.

66. About the same time, Chief Mike Conner prepared a "voluntary statement"

purporting to memorialize his version of the investigation and arrest of David Fontenot for the church burglary, which account also failed to disclose the suggestive and coercive interrogation tactics that had been used.

67.    On January 25, 1998, unknown officers with the Lake Arthur police department and/or the Jefferson Davis Sheriff's office went back out to the McClure Street residence of Vicki Perez, and they obtained written statements from Cynthia Marie LaFosse and Vicki Perez. The police who obtained these statements did not sign as witnesses to these statements.

68.    Thereafter, on January 28, 1998, Mike Conner went to the home of Glen Trahan, age 16 years, in Jennings, Louisiana and obtained his statement, which purported to relate a conversation between Joe Edwards and Glen Trahan, during which Edwards told Glen that Justin Oliver was a friend of Edwards who was "into witchcraft." According to the statement, Trahan told Edwards to have Oliver phone him, which Oliver did, at which time Oliver inquired about Black Masses and  satanic rituals. Trahan said Oliver invited Trahan to stay at Oliver's house for a week, during which time Trahan taught Oliver the "basics" of the satanic Black Mass ritual and explained that they needed a vessel, "crackers," holy water, and the blood of a cat. According to Trahan's statement, Justin told Edwards that he could get what was needed for the Black Mass from the church. Trahan disclaimed any further contact with Justin, but said he learned about a week later, from Joe Edwards, of Justin's arrest. Trahan's statement contains no reference to David Fontenot or James Vincent.

69.    Thereafter, separate prosecutions were commenced against Justin Oliver and James Vincent in juvenile court, and against David Fontenot in state District Court.

70.    On March 2, 1998, the Jefferson Davis Parish District Attorney's office, headed by Michael C. Cassidy, District Attorney, and staffed by, *inter alia*, André J. Buisson, Assistant District Attorney, filed a Bill of Information, in matter docketed as number CR-1305-98, in the 31st District Court for the Parish of Jefferson Davis, entitled,

"State of Louisiana v. David Fontenot," charging plaintiff with the January 20, 1998 simple burglary of a religious building, in violation of La. Rev. Stat. 14:62.6.

71.    On the day of his son's first appearance in the case, on or about March 2, 1998, and before retaining defense counsel, Douglas Fontenot took his son, David Fontenot, to meet with the District Attorney, Michael C. Cassidy, who is also the cousin of Douglas Fontenot, to complain about the beating David had received at the Lake Arthur police department and demanding that the police officers be prosecuted.

72.    On information and belief, following that meeting, the District Attorney commenced an internal investigation into the allegations of police brutality, but ultimately decided not to prosecute the officers who were the subject of plaintiffs' complaints.

73.    On March 13, 1998, William D. Dyess acting as criminal defense counsel for plaintiff, filed a Motion for Preliminary Examination in case number CR 1305-98 and the State District Court set it for hearing on Monday, April 6, 1998.

74.    Having been put on notice of the allegations of police misconduct relating to the arrest of David Fontenot for the church burglary, on March 24, 1998 the Jefferson Davis Parish District Attorney's office elected to present its view of the case against David Fontenot to a Grand Jury, and obtained an indictment of David Fontenot for the crime of  simple burglary of a religious building, in violation of La. Rev. Stat. 14:62.6. This indictment was filed with the 31st District Court for the Parish of Jefferson Davis, under case number CR-2079-98, entitled, "State of Louisiana v.  David Fontenot."  It duplicated the charge previously filed against David Fontenot by Bill of Information

75.    On March 30, 1998, the Jefferson Davis Parish District Attorney's District entered a Nolle Prosequi to the Bill of Information in case number CR-1305-98, thus dismissing that case; this action had the effect of removing plaintiff's right to a preliminary hearing to contest probable cause as concerns his alleged part in the church burglary.

76.   About the same time, proceedings were commenced against Justin Oliver in juvenile court and he entered a plea of guilty as charged.

77.   On March 30, 1998, David Fontenot, appeared for his arraignment, at which time plaintiff pled not guilty.

78.   On April 6, 1998, plaintiff's defense counsel, Mr. Dyess, filed a motion for discovery and inspection of evidence, and the State responded that it would mail Mr. Dyess copies of their entire file.

79.   On April 17, 1998, Mr. Dyess filed a motion to suppress David Fontenot's confession, alleging that it had been the product of coercive custodial interrogation and the State District Court set it for hearing on May 18, 1998.

80.   On April 28, 1998, District Attorney Cassidy sent a letter to the clerk of Court requesting subpoenas to Monty Chavalier, Rayford Fontenot,. Faron Schexnider, and Chief Conner to appear on May 18, 1998 for the hearing on the Motion to Suppress the Confession.

81.   On April 13,1998, Mr. Dyess filed a Memorandum in Support of the Motion to Suppress Confession giving details of the coercive custodial interrogation that produced the "confession" sought to be suppressed.  On this same date, Mr. Dyess requested subpoenas to compel the following witnesses to attend the hearing on the motion to suppress:  Mike R. Conner, Andrew P. Benoit, Nicholas Broussard, Monty Chevalier, Faren Schexnider, Rayford Fontenot, James Vincent, Cheryl Vincent, Suzanne Vincent, Justin Oliver, and Dr. Young Bin Kang.

82.   After a joint continuance was requested of the May 18, 1998 hearing, the District Attorney's office on May 19, 19998, requested subpoenas be issued, this time only for Officer Chavalier and Chief Conner for the new hearing date of June 15, 1998.

83.   On June 15, 1998, Mr. Dyess filed a Supplemental Memorandum in Support of the Motion to Suppress David Fontenot's  Confession, in which memorandum Mr. Dyess detailed the coercion of James Vincent and the fact that

Vincent's cousin was David Michael Fontenot, not David Lee Fontenot. Following that, the Jefferson Davis Parish District Attorney's office, acting through W. J. Riley, III, stipulated that the District Attorney's Office would not use the confession of David Fontenot. According to the Court's minutes, "based on that agreement" the Court suppressed David Fontenot's confession. The Court then fixed the case for jury trial to be held on September 14, 1998.

84. On September 14, 1998, however, the District Attorney's office moved to continue trial to November 16, 1998. On November 16, 1998, the Court rescheduled the jury trial for January 25, 1999, but it did not go to trial on that date.

85. On January 8, 1999, the plaintiffs filed their original complaint in this federal civil rights action.

86. On May 17, 1999, Michael Conner, Nicholas Broussard, Andrew Benoit, and Monty Chevalier of the Lake Arthur Police Department filed their joint Answer to this federal civil rights suit

87. On May 28, 1999, Rayford Fontenot, Richard E. Edwards (Sheriff), and Curtis Fontenot of the Jefferson Davis Sheriff's Department filed their joint answer. Their answer was prepared by the law firm of Buisson & Cassidy of Jennings, Louisiana of which District Attorney Cassidy and Assistant District Attorney, André Buisson, are partners.

88. On October 19, 1999, the deposition of David Lee Fontenot was taken in this case, at which time André Buisson participated in that deposition as attorney for those defendant police officers who were employed by Jefferson Davis Parish, and Mr. Buisson defend them in their individual and official capacities.

89. On January 5, 2000 the deposition of Justin Oliver was taken in this federal civil rights case, at which time another member of the firm of Buisson & Cassidy participated in that deposition as attorney for the police officers in both their individual and official capacities, as deputies employed by Jefferson Davis Parish.

90.    On March 23, 2000, the deposition of James Vincent was taken in this federal civil rights case, at which another member of the firm of Buisson & Cassidy participated in that deposition as attorney for those police officers employed by Jefferson Davis Parish in their individual and official capacities.

91.    On August 31, 2000, Mr. Dyess filed a Motion to Recuse the District Attorney Cassidy from the criminal case, pointing out that the Law Firm of Buisson and Cassidy, of which Michael C. Cassidy was a partner, had been employed by the Sheriff of Jefferson Davis Parish, and his deputies, Curtis Fontenot and Rayford Fontenot, to defend  them in their individual and official capacities in plaintiffs' federal civil rights case and that such dual representation constituted a conflict of interest for the District Attorney's Office.  The Court set hearing on the motion to recuse for September 11, 2000.

92.    On September 11, 2000, the Jefferson Davis District Attorneys Office indicated in open court that it would recuse itself from the prosecution of plaintiff's criminal case.  Based on that stipulation, the Court ordered Michael C. Cassidy recused from the criminal case.  The case was eventually reset for trial on November 13, 2000.

93.    On November 13, 2000, the Jefferson Davis District Attorney's Office advised the state judge that the criminal case against David Fontenot was being handled by the Louisiana Attorney General's office, in view of the recusal.

94.    On March 14, 2001, Mr. Dyess filed a Motion for Speedy Trial in the criminal case.  The sheriff's office served a copy of this motion on the state attorney general on March 23, 2001.

95.    On April 11, 2001, Mr. Dyess filed a Motion for Preliminary Hearing, which was set for hearing on June 25, 2001 in the state criminal case.

96.    On April 30, 2001, Mr. Dyess filed another pleading, entitled, "Motion to Fix Hearing on Preliminary Examination, Dismissal and For Speedy Trial and the Court set a hearing date on these motions for June 25, 2001.

97.     On May 22, 2001, the Attorney General's office sent a letter to the Clerk of Court for Jefferson Davis requesting a copy of all court minutes in the criminal case against David Fontenot.

98.     On June 1, 2001, unknown member(s) of the Lake Arthur Police Department obtained a written statement from Zachary Radke, age 18. On information and belief, police coerced Mr. Radke into making that statement, which purports to state that "Capone" David Fontenot, as well as Vicky Perez and Justin Oliver," all broke into the church. No police officer signed on the line of this statement reserved to identify the officer taking the statement. The police gave this statement to their lawyers in plaintiff's civil rights case.

99.     On June 19, 2001, attorney John Wilkes, III, defending the Lake Arthur police officers in plaintiffs' civil rights case, sent a facsimile to Chris Villemarette, formerly representing plaintiffs in his federal civil rights suit, attaching Radke's statement.

100.    On June 25, 2001, the Attorney General's Office appeared for the hearing in the state criminal case, at which time the Court listened to Mr. Dyess's argument on his speedy trial motion and at which time a copy of the entire record of the criminal case was introduced into evidence. Upon hearing no objection from the Attorney General's office, the state court judge dismissed the criminal case against plaintiff.

101.    Following the dismissal of the prosecution against his son, plaintiff contacted Trooper Tracey Morgan of the Louisiana State Police, in an attempt to press brutality charges against the Lake Arthur Police Officers. On information and belief, Officer Morgan contacted the District Attorney to ascertain the status of the investigation, if any, that his office had made of the brutality charges. The District Attorney advised Officer Morgan that despite having evidence that Rayford Fontenot had, indeed, struck, choked and thrown David Lee Fontenot against walls, cabinets and/or lockers, that Cassidy would exercise his prerogative not to prosecute. When

Officer Morgan advised Douglas Fontenot of the District Attorney's decision, Douglas Fontenot demanded that the Louisiana State Police undertake an investigation and turn over their findings to a proper prosecuting authority. To date, however, neither the Attorney General, nor any federal prosecutor, has instituted charges against the offending officers identified above.

## FIRST CAUSE OF ACTION AGAINST INDIVIDUAL DEFENDANTS FOR VIOLATION OF FIFTH AMENDMENT RIGHTS.

102. Plaintiffs repeat the allegations of paragraphs 1 - 101 contained herein.

103. Plaintiff, David Lee Fontenot, was subjected to coercive custodial interrogation in violation of the 5th Amendment of the United States Constitution, as a result of the actions of the following individuals, acting alone and/or in concert with others, and with the specific intent to violate the aforementioned right:

### Rayford Fontenot

104. Rayford Fontenot battered, assaulted, and intentionally and negligently, inflicted emotional distress on plaintiff, David Lee Fontenot, among other acts and omissions, committed while David Lee Fontenot was in police custody at the Lake Arthur police department.

### Mike Conner

105. Mike Conner, despite plaintiff's assertion of his Fifth Amendment right not to give a statement, conspired to coerce a "confession" from plaintiff, by badgering plaintiff, along with other officers, with questions in an interrogation chamber. Chief Conner further facilitated Rayford Fontenot's highly coercive custodial interrogation of plaintiff by:

! Instructing other police officers to leave plaintiff alone in an interrogation chamber with Rayford Fontenot;

! By condoning and/or showing intentional indifference to, and otherwise collaborating in the refusal to prevent, the escalating level of coercive custodial

interrogation.

Chief Conner further failed to report Rayford Fontenot to his superiors for battery, assault, and coercive custodial interrogation of David Fontenot.

**Nicholas Broussard**

106. Nicholas Broussard, as well as any other Town of Lake Arthur Police officer within hearing distance of plaintiff's custodial interrogation, acted alone and in concert with other officers, and with specific intent to facilitate, condone, show intentional indifference to, and otherwise fail to investigate, stop, and report to proper authorities the coercive custodial interrogation of plaintiff and other violations of plaintiff's civil rights.

**Andrew Benoit**

107. Andrew Benoit, as well as any other Town of Lake Arthur Police officer within hearing distance of plaintiff's custodial interrogation, acted alone and in concert with other officers, and with specific intent to facilitate, condone, show intentional indifference to, and otherwise fail to investigate, stop, and report to proper authorities the coercive custodial interrogation of plaintiff and other violations of plaintiff's civil rights.

108. By reason of the above actions of Rayford Fontenot, Mike Conner, Nicholas Broussard, Andrew Benoit, and other members of the Lake Arthur Police Department, whose full participation is not presently known to plaintiff, David Lee Fontenot, suffered great humiliation and mental anguish, as well as physical injury, and was deprived of his constitutional right under the Fifth Amendment to the Constitution of the United States, for which the individual defendants named above are liable for compensatory and exemplary or punitive damages.

**Monty Chevalier**

109. Monty Chevalier, as well as any other Town of Lake Arthur Police officer

within hearing distance of plaintiff's custodial interrogation, acted alone and in concert with other officers, and with specific intent to facilitate, condone, show intentional indifference to, and otherwise fail to investigate, stop, and report to proper authorities the coercive custodial interrogation of plaintiff and other violations of plaintiff's civil rights.

110.    By reason of the above actions of Rayford Fontenot, Mike Conner, Nicholas Broussard, Andrew Benoit, Monty Chevalier, and other members of the Lake Arthur Police Department, whose full participation is not presently known to plaintiff, David Lee Fontenot, suffered great humiliation and mental anguish, as well as physical injury, and was deprived of his constitutional right under the Fifth Amendment to the Constitution of the United States, for which the individual defendants named above are liable for compensatory and exemplary or punitive damages.

## SECOND CAUSE OF ACTION AGAINST INDIVIDUAL DEFENDANTS FOR MALICIOUS PROSECUTION WHEN PROBABLE CAUSE NEVER EXISTED AND/OR HAD EVAPORATED, IN VIOLATION OF PLAINTIFF'S FOURTH AMENDMENT RIGHT TO BE FREE FROM UNREASONABLE SEIZURE AND FIFTH AMENDMENT

RIGHT TO FAIR TRIAL

111.    Plaintiffs repeat the allegations of paragraphs 1 - 110 contained herein.

112.    Plaintiff was the victim of the maintenance of a malicious prosecution, as a result of the lack of probable cause at the very beginning of the police investigation and/or as a result of the evaporation of probable cause as the investigation progressed, in violation of his 4th Amendment right against unreasonable seizure and his 5th Amendment right to a Fair Trial as a result of the actions of the following individuals:

**Mike Conner**

113.    Mike Conner did the following:

!    Used suggestive questioning techniques, alone and in concert with other officers, when interrogating suspects and/or interviewing witnesses;

!    Acted on unreliable tipsters and uncorroborated information in coming to the conclusion that the church burglary was committed by three perpetrators;

!    Failed to act reasonably when he knew or should have known, from previous police encounters, that there were two David Fontenots in Lake Arthur, and upon the discovery that Justin's Oliver's cousin was David Michael Fontenot and that Justin's account of having ridden bikes with his cousin was consistent with David Lee Fontenot's claims of innocence, including plaintiff's statements that he was not the cousin of James Vincent, that he did not own a bike, and that he did not participate in the church burglary;

!    Participated in coercing Justin Oliver and James Vincent into falsely implicating David Lee Fontenot in a crime, despite indications that David Lee Fontenot was innocent;

!    After learning that all three "suspects," once freed from the coercive  environment at police headquarters, recanted their implication of David Lee Fontenot and James Vincent in the crime, Chief Conner conspired to cover up the coercion that led to the false "confessions," and took other actions to maintain a malicious prosecution in the face of a lack of evidence, all to avoid civil liability;

!     Led a police conspiracy to falsely report and suppress the truth surrounding the violation of plaintiff's constitutional rights:

i.     By failing to prepare an honest narrative recounting the details of his investigation and the arrests made in connection with the church burglary; making only an aborted entry on the narrative section of the original incident report for the Church burglary, and assigning Monty Chevalier the task of writing a report about his, Chief Conner's, investigation, without adequately briefing Chevalier about facts known only to Chief Conner;

ii.     By failing to report that police had picked up a second David Fontenot, namely David Michael Fontenot, in connection with the Church burglary;

iii.     By failing to determine that Vincent James was the cousin of David Michael Fontenot;

iv.     Overtly facilitating, tacitly approving, and otherwise supporting the actions of Rayford Fontenot, including failing to report Rayford Fontenot to the appropriate authorities for conducting a coercive custodial interrogation of plaintiff, David Lee Fontenot;

v.     By conspiring with André Buisson and other attorneys in Michael Cassidy's private law firm to defend plaintiffs' civil rights case through the use of investigative resources of the Lake Arthur police department to maintain a malicious criminal prosecution when Chief Conner knew or should have known that, as a consequence of suggestive and coercive police interrogation techniques, and other unreliable information received, there was no probable cause for plaintiff's arrest and/or that probable cause had evaporated as the investigation progressed;

vi.     By acting alone and in concert with other officers to harass plaintiff and his family in the hope of intimidating them into discontinuing their civil rights suit;

vii.    Participating in coercive techniques to obtain a false "statement" from Zachary Radeke that no police officer was willing to sign as witness, simply to coerce plaintiff to plead guilty to the criminal charges, which would thwart plaintiffs' civil rights action.

### Monty Chevalier

114.    Monty Chevalier, apparently on Chief Conner's orders, wrote the "supplementary report" for the crime, failing to disclose the details that led Chief Conner to first believe that Justin Oliver had the assistance of two others when committing the church burglary, or the details for Conner's initial belief that the co-perpetrators were named James Vincent and David Fontenot.    Although Officer Chevalier reported that police originally detained David Michael Fontenot before arresting David Lee Fontenot, he did not disclose the source and other details that led police to where David Michael Fontenot lived, or that led police to detain David Michael Fontenot in connection with the church burglary.    He further failed to reveal the coercion that had been used against plaintiff and the other suspects in getting them to write statements.

115.    Monty Chevalier actively discouraged other police, including Officer Faron Schexnayder, from reporting the violation of plaintiff's rights to the proper authorities, thus facilitating the malicious prosecution of plaintiff.

### Michael Cassidy and André Buisson

116.    Michael Cassidy, the District Attorney, and André Buisson, the Assistant District Attorney, motivated by a conflict of interest, conspired with members of the Jefferson Davis and Lake Arthur police departments, as well as with others, to maintain a malicious prosecution when it was unreasonable to do so for lack of evidence, all in order to delay and/or otherwise thwart the institution and prosecution of plaintiff's civil rights case.

117.    Michael Cassidy and André Buisson, motivated by a conflict of interest, directed police officers in their continued "investigation" of the crime, long after all of

the stolen property was recovered, and long after learning that the sole evidence of any link between David Lee Fontenot and the crime were coerced "confessions,"which had been repudiated by the three interviewees, all with specific intent to continue the malicious prosecution of David Fontenot when it was unreasonable to do so for lack of evidence, simply to delay and/or otherwise thwart the institution and prosecution of plaintiff's civil rights claims against the law enforcement officers that were being defended by the law firm of Buisson & Cassidy of Jennings, Louisiana.

**Rayford Fontenot**

118.   Rayford Fontenot gave a false statement concerning his participation in the investigation of the church burglary and false account of his interrogation of David Lee Fontenot and other suspects and/or witnesses, which contributed to the malicious prosecution of David Lee Fontenot.

119.   On information and belief, Rayford Fontenot, along with other members of the Jefferson Davis and Lake Arthur police departments, further participated in acts designed to obtain a false "statement" from Zachary Radeke, falsely implicating David Lee Fontenot in the church burglary.

120.   Rayford Fontenot along with other members of the Jefferson Davis and Lake Arthur police departments, have harassed plaintiff and his family in hopes of intimidating them from continuing their civil rights suit.

121.   By reason of the above, plaintiff, David Lee Fontenot suffered great humiliation and mental anguish, as well as physical injury, and was deprived of his constitutional right under the Fourth and Fifth Amendments to the Constitution of the United States, for which the individual defendants named above are liable for compensatory and exemplary or punitive damages.

## THIRD CAUSE OF ACTION AGAINST THE TOWN OF LAKE ARTHUR, THE LAKE ARTHUR POLICE DEPARTMENT, AND THE JEFFERSON DAVIS PARISH DISTRICT ATTORNEY'S OFFICE FOR MALICIOUS PROSECUTION WHEN PROBABLE CAUSE NEVER EXISTED OR HAD EVAPORATED, IN VIOLATION OF PLAINTIFF'S CIVIL RIGHTS.

122.    Plaintiffs repeat the allegations of paragraphs 1 - 121 contained herein.

123.    The Town of Lake Arthur and the Lake Arthur Police Department are liable under 42 U.S.C. 1983 for Fourth and Fifth Amendment violations and malicious prosecution as a result of the actions of their Chief of Police, Mike Conner, their policymaker, who either announced to all or selected officers, including Rayford Fontenot,  an "official policy" to engage in and/or sanction coercive custodial interrogations and/or proceeded to act as final decisions maker to  personally use and condone the use of interviewing methods against suspects and witnesses, that were excessively coercive and suggestive, such that the statements obtained could not produce objective information that a reasonable law enforcement officer could use in the course of an investigation.

124.    The Town of Lake Arthur and the Lake Arthur Police Department are liable under 42  U.S.C. 1983 for malicious prosecution in being deliberately indifferent to the need to train and discipline its officers in order to prevent 4th and 5th Amendment violations by police officers.  Not only do plaintiffs allege acts of physical and verbal coercion against David Lee Fontenot, they have evidence that Lake Arthur police perpetrated the same or similar acts of custodial coercive interrogation upon other suspects, some of whom are involved in this case, constituting evidence of a persistent and widespread custom of coercive custodial interrogation by Lake Arthur police.

125    The Town of Lake Arthur and the Lake Arthur Police Department are additionally liable under 42  U.S.C. 1983 for malicious prosecution as a result of the actions of their Chief of Police, Mike Conner, their policymaker, who maintained a policy of allowing the same police officers who were the subject of civil rights claims, to

continue to conduct additional "criminal investigations" into the underlying criminal charges against their accusers, thus showing deliberate indifference to the conflict of interest that would motivate the maintenance of a malicious prosecution.

126.    The Parish of Jefferson Davis and its District Attorney's Office, are liable under 42 U.S.C. 1983, as a result of the actions of District Attorney, Michael C. Cassidy, its policymaker, who apparently was motivated by the conflict of interest arising from his private law firm's defense of the Parish and its police officers in the civil rights claim, and perhaps without announcing any "official policy" to maliciously prosecute simply to thwart or otherwise aid the defense of civil rights actions against the Parish, did maintain a malicious prosecution of David Lee Fontenot, when he knew, or should have known, that probable cause did not exist and/or had evaporated.    127.    The Parish of Jefferson Davis and its District Attorney's Office are further liable under 42 U.S.C. 1983 for being deliberately indifferent to the need to promulgate and implement policies to control conflicts of interest that are likely to lead to malicious prosecutions, and that did lead to the malicious prosecution of David Fontenot.

128.    By reason of the above, plaintiff, David Lee Fontenot, suffered great humiliation and mental anguish;  was forced to expend costs and attorneys fees in defense of a malicious prosecuted criminal case;  was forced to post a $1,500 bond, which remained in the Court's coffers earning no interest for his benefit from the date of his arrest until dismissal of the charges against him nearly four years later;  was forced to endure certain restraints on his liberty as a condition of his bond to gain his release from jail;  and was deprived of his constitutional rights under the Fourth and Fifth Amendments to the Constitution of the United States, for which the individual defendants named above are liable for compensatory and exemplary or punitive damages.

## FOURTH CAUSE OF ACTION FOR CLAIMS UNDER STATE LAW FOR BATTERY, ASSAULT, MALICIOUS PROSECUTION, AND INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

129.    Plaintiffs repeat the allegations of paragraphs 1 - 128 contained herein.

130.    Rayford Fontenot, and those police officers conspiring with him identified above, are liable for battery, assault, intentional and negligent infliction of emotional distress, and malicious prosecution of David Lee Fontenot.

131.    Jefferson Davis Parish Sheriff Ricky Edwards, Jr. is vicariously liable for the actions of Deputy Rayford Fontenot, who serves under Sheriff Edwards and is employed by him.

132.    Lake Arthur Police Chief Mike Conner is vicariously liable for the actions of the officers identified above, who serve under him and whom he employs.

133.    The Town of Lake Arthur, Lake Arthur Police Department, Jefferson Davis Parish Sheriff Ricky Edwards, Jr., and Lake Arthur Police Chief Mike Conners, are liable for grossly failing to train their police officers in the fundamental law of investigation, arrest and interrogation of suspects and/or witnesses, as well as for failing to train their police officers to verify information supplied by citizens and other informants.

134.    The Town of Lake Arthur, Lake Arthur Police Department, Jefferson Davis Parish Sheriff Ricky Edwards, Jr., and Lake Arthur Police Chief Mike Conner, are liable for encouraging arrest without probable cause, coercive interrogation, battery and assault of criminal suspects, witnesses, and malicious prosecution and for ratifying same by systemic deficiencies in disciplining officers or in the investigation of complaints against officers.

135.    The foregoing acts, omissions, and systemic failures are customs and policies of The Town of Lake Arthur, Lake Arthur Police Department, Jefferson Davis Parish Sheriff Ricky Edwards, Jr., and Lake Arthur Police Chief Mike Conners, caused

police officers employed by these defendants, and named herein as defendants, to believe that determination of the right to arrest and use coercive interrogation techniques was within their discretion, and that complaints of illegal arrest, use of coercive interrogation, falsified and otherwise inaccurate reporting of police investigations, would not be honestly or properly investigated, with the foreseeable result that officers would be likely to illegally arrest, use coercive interrogation, and falsify police reports against criminal suspects and/or witnesses.

136.  As a direct and proximate cause of the aforesaid acts, omissions, policies and customs of The Town of Lake Arthur, Lake Arthur Police Department, its governing body, the Jefferson Davis Parish Sheriff Edwards and Chief Mike Conners, individual police officers employed by these entities improperly investigated, improperly arrested, coercively interrogated, improperly falsified police reports, and maintained a malicious prosecution against David Lee Fontenot.

137. The District Attorneys Office for Jefferson Davis Parish is liable for encouraging malicious prosecution without probable cause and/or ratifying same by systemic deficiencies in preventing conflicts of interest when lawyers serving as its District Attorney and Assistant District Attorneys also defend the Parish and its police officers in private suits arising out of police activity; and by further failing to prosecute and/or alert proper the proper state or federal authorities as to evidence of police brutality and other police misconduct.

138.  The foregoing acts, omissions, and systemic failures are customs and policies of Jefferson Davis Parish,  and its District Attorneys Office, and caused Parish prosecutors to believe that maintenance of a malicious prosecution, lacking in probable cause and motivated by a conflict of interest, was within their discretion, and that complaints of conflicts of interest and malicious prosecution would not be honestly or properly investigated, with the foreseeable result that prosecutors would be likely to ignore conflicts of interest and maintain malicious prosecutions.

139. The foregoing acts, omissions, and systemic failures, which are customs and policies of the Jefferson Davis Parish Sheriff's Office and District Attorneys Office, also caused Parish Deputies and Lake Arthur Police to believe that acts of police brutality and other police misconduct were within their discretion, and that complaints about such acts would not be honestly or properly investigated, with the foreseeable result that police investigations would not produce objective information that a reasonable law enforcement officer could use in the course of an investigation, but would lead to a malicious prosecution.

140. As a direct and proximate cause of the aforesaid acts, omissions, policies and customs of the District Attorneys Office for Jefferson Davis Parish, Michael C. Cassidy, Andre Buisson, and other prosecutors employed by these entities, had conflicts of interest that led them to maintain a malicious prosecution against David Lee Fontenot and led them to encourage Parish and Lake Arthur police officers to likewise maintain a malicious prosecution.

141. By reason of the above, plaintiff, David Lee Fontenot, suffered great humiliation, mental anguish and emotional distress; was forced to expend costs and attorneys fees in defense of a maliciously prosecuted criminal case; and was deprived of his constitutional rights under the Louisiana Constitution, for which the individual defendants named above are liable for compensatory and exemplary or punitive damages.

## FIFTH CAUSE OF ACTION FOR CLAIMS UNDER STATE LAW FOR LOSS OF CONSORTIUM AND POLICE HARASSMENT

142. Plaintiffs, Douglas Fontenot and Henrietta Fontenot, repeat the allegations of paragraphs 1 - 141 contained herein.

143.   As a result of the foregoing acts, omissions, policies, customs, and systemic failures of the individuals and entities named as defendants herein, plaintiffs, Douglas Fontenot and Henrietta Fontenot, parents of David Lee Fontenot, suffered a loss of consortium and other disruption in their family home and relations with their son.  They further suffered a souring in their regard for and confidence in the public entities herein made defendants; other mental anguish and emotional distress, all of which were aggravated by  police harassment designed to retaliate and/or intimidate them into discontinuing support for their own and fpr their son's civil actions against defendants.

144.  As a result of the foregoing acts, omissions, policies, customs, and systemic failures of the individuals and entities named as defendants herein, Douglas Fontenot and his wife, Henrietta Fontenot, suffered a loss of income for the following reasons:

a.   Douglas Fontenot delayed decision for a period of 11 months to accept a position with his present employer because it would require extensive travel and he feared leaving his family alone and subject to police intimidation and harassment;

b.   On information and belief, Douglas Fontenot believes that he lost two contracts  as a result of the highly publicized account of his son's arrest and prosecution for the church burglary.

WHEREFORE, plaintiffs pray for jury trial and in due course judgment for compensatory and exemplary damages, for attorneys fees, expenses and costs, for legal interest from the date of judicial demand, as well as all other legal and equitable damages and other relief to which they are entitled in the premises.

Respectfully submitted,

DAVID LEE FONTENOT

HENRIETTA L. FONTENOT

DOUGLAS L. FONTENOT
326 NORTH HWY. 26
LAKE ARTHUR, LA 70549
(337) 774-3625

U. S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
FILED

AUG - 5 2002

ROBERT H. SHEMWELL, CLERK
BY _____
                    DEPUTY

## <u>VERIFICATION</u>

STATE OF LOUISIANA
PARISH OF JEFFERSON DAVIS

      BEFORE ME, personally came and appeared:  **David Lee Fontenot**, who having been first duly sworn, deposed as follows:

      That he has read the above and foregoing amended petition and that the allegations of fact contained therein are true and correct to the best of his knowledge.

SWORN TO AND SUBSCRIBED
before me, this _____ 1 ___ day of __Aug__, 2002.

_____
NOTARY PUBLIC

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## <u>VERIFICATION</u>

STATE OF LOUISIANA
PARISH OF JEFFERSON DAVIS

      BEFORE ME, personally came and appeared: **Douglas Fontenot**, who having been first duly sworn, deposed as follows:

      That he has read the above and foregoing amended petition and that the allegations of fact contained therein are true and correct to the best of his knowledge.

SWORN TO AND SUBSCRIBED
before me, this _____ 1 ___ day of __Aug__, 2002.

_____
NOTARY PUBLIC

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# VERIFICATION

STATE OF LOUISIANA
PARISH OF JEFFERSON DAVIS

BEFORE ME, personally came and appeared: **Henrietta L. Fontenot**, who having been first duly sworn, deposed as follows:

That she has read the above and foregoing amended petition and that the allegations of fact contained therein are true and correct to the best of her knowledge.

SWORN TO AND SUBSCRIBED
before me, this _____ 1 _____ day of _Au G_ , 2002.

_____
NOTARY PUBLIC